UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



———————————————————————

TANYA LYN SIMPSON,

Plaintiff,

v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

Defendant.

———————————————————————

**DECISION AND ORDER**

6:15-CV-06244 EAW

## I.   INTRODUCTION

Represented by counsel, Plaintiff Tanya Lyn Simpson ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of Carolyn W. Colvin, Acting Commissioner of Social Security ("the Commissioner"), denying Plaintiff's application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). (Dkt. 1). Presently before the Court are the parties' opposing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. 11, 13). For the reasons set forth below, the Commissioner's motion is denied, Plaintiff's motion is granted in part, and this matter is remanded for further administrative proceedings.

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.   Overview

On September 29, 2009, Plaintiff filed an application for SSI and SSD benefits. (Administrative Transcript (hereinafter "Tr.") at 143-155). In her application, Plaintiff

alleged that she had been disabled since September 30, 2008. (*Id.*). Plaintiff's applications for DIB and SSI were initially denied on October 29, 2009. (*Id.* at 66-71). Plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 72-73). Plaintiff appeared at two hearings before Administrative Law Judge ("ALJ") Jennifer Whang on January 7, 2011, and May 4, 2011. (*Id.* at 9-11, 15-47). On May 23, 2011, ALJ Whang issued a decision finding Plaintiff not disabled. (*Id.* at 49-65). The Appeals Council denied Plaintiff's request for review on September 27, 2011. (*Id.* at 1-2). This Court subsequently reversed the ALJ's decision and remanded the matter. (*Id.* at 573-83).

On remand, the Appeals Council sent the matter back for a new hearing and decision. (Tr. 585-89). Plaintiff testified at a hearing before ALJ John Costello on October 15, 2013. (*Id.* at 480-547). Vocational Expert ("VE") Peter Manzi[1] also testified at the hearing. (*Id.* at 538-46). ALJ Costello issued a decision on January 9, 2014, in which he found Plaintiff not disabled. (*Id.* at 451-79). On February 25, 2015, the Appeals Council denied Plaintiff's request for review, rendering ALJ Costello's decision the final decision of the Commissioner. (*Id.* at 438-43). Plaintiff commenced this action on April 24, 2015. (Dkt. 1).

### B.     The Non-Medical Evidence

Plaintiff was 37 years old on the date of the hearing before ALJ Costello. (Tr. 488). She was single and had no children. (*Id.*). She testified that she had last worked as a debt collector in 2008. (*Id.* at 488-91). She stated that her attendance at that job was

---

[1]     Mr. Manzi is referred to as "Peter Mansy" in the hearing transcript.

poor and that she would have been fired due to attendance issues had the company not gone out of business. (*Id.* at 490-91).

Plaintiff testified that she had minor scoliosis in her back and that the pain was approximately a six or seven on a scale of one to ten. (*Id.* at 499-500). Plaintiff stated that she "very, very rarely" would take aspirin for pain, but that she did not want to mix pain medication with her other medications. (*Id.* at 500-01). Plaintiff further testified that she had been to physical therapy for her back issues in the past, and that she had been given a referral for additional physical therapy roughly a week and a half prior to the hearing date. (*Id.* at 501). Upon questioning from the ALJ about her past compliance with medical referrals, Plaintiff testified that it was very difficult for her to follow through on things and that she had "a very big problem with procrastination." (*Id.* at 502-03).

Plaintiff testified that she had briefly received chiropractic treatment for her back in 2008 and either 2010 or 2011. (Tr. 505). According to Plaintiff, the chiropractic treatment did not help. (*Id.* at 506). Plaintiff stated that she had "many problems" with lifting and carrying, bending, and standing to do dishes. (*Id.*). Plaintiff told the ALJ that she did not bend because of the pain it caused her and that the heaviest thing she could lift was a gallon of water. (*Id.* at 507).

Plaintiff testified that she was unable to sit for long periods of time and would usually have to stand within half an hour. (Tr. 508). She stated that standing was worse than sitting, and that she could sometimes stand for only two minutes, and that at other times, she could stand "for a good ten minutes." (*Id.*). Plaintiff also stated that she had

- 3 -

problems with walking as a result of the pain in her back and that she could typically only walk for ten minutes before she needed to sit down. (*Id.* at 509).

Plaintiff also told the ALJ that she had problems with her hands. (Tr. 509). Specifically, she stated that she had carpal tunnel syndrome and arthritis and that as a result, her hands would go numb and she would be unable to grip items. (*Id.*). Plaintiff testified that she had previously worn a brace, but that it did not help. (*Id.* at 510). Plaintiff stated that the numbness in her hands would typically last for seven to ten minutes. (*Id.* at 510-11).

Turning to her mental health concerns, Plaintiff testified that was "over compulsive" and "obsessed with stuff." (Tr. 512). Plaintiff stated that she wanted things to be perfect and "[her] way" or "it would be a problem." (*Id.* at 513). As an example of her obsessive behavior, Plaintiff told the ALJ that she would clean every nook and cranny of the vents in her house and make sure that her cupboards were in order. (*Id.*). When asked by the ALJ if she ever used a screwdriver to take apart the vents, Plaintiff stated that she would "try to force [herself] not to do that stuff" and to not move that often. (*Id.* at 513-14). Plaintiff also told the ALJ that she could not touch anything that had not been cleaned by her, and that she would vacuum behind her refrigerator after sliding it out from the wall. (*Id.* at 515). Plaintiff told the ALJ that her refrigerator was on wheels. (*Id.*).

Plaintiff testified that she had a driver's license and a car, and that she would do her laundry at a laundromat because she did not like the thought of using the laundry facilities in her apartment building. (Tr. 516-17). Plaintiff also testified that she rarely

- 4 -

cooked meals and that she usually ate sandwiches or canned goods, and that she "microwaved a lot." (*Id.* at 517).

Plaintiff told the ALJ that she was taking Luvox and Risperdal for her mental health issues. (Tr. 518). Plaintiff testified that other than one occasion where she was unable to get a refill of the Luvox, she took her medications regularly and as prescribed. (*Id.* at 519). Plaintiff stated that she had gotten her physician's approval to lower her doses of these medications due to concerns about side effects. (*Id.* at 520-21). She explained that she found it difficult to take medications and that "in order for [her] to take the pill," she had to "sell [herself] a story." (*Id.* at 521).

Plaintiff testified that she had used marijuana in the past but was not a current user. (Tr. 524). Plaintiff also testified that she would occasionally drink alcohol, the last time having been three months prior to the date of the hearing. (*Id.* at 524-25). Plaintiff stated that around 2003 or 2005, she had issues with drinking alcohol to excess. (*Id.* at 525).

Plaintiff told the ALJ that she also suffered from "slight paranoia" and "some ADD." (Tr. 525). Plaintiff testified about her treatment with licensed medical social worker ("LMSW") Sarah Lechner. (*Id.* at 526). Plaintiff stated that she had been seeing LMSW Lechner every two weeks for approximately one year and that she had missed maybe one or two appointments in the previous six months. (*Id.*). Plaintiff also stated that she saw a psychiatrist once every one to two months, but that she did not know her name. (*Id.* at 527).

Upon questioning from the ALJ, Plaintiff testified that in April of 2011, she "probably" wasn't taking her medications as prescribed. (Tr. 528). Plaintiff explained again that it is very difficult for her to convince herself to take medication because of her fears about side effects. (*Id.*).

Plaintiff told the ALJ that she had recently switched physicians after being "kicked out" of her previous physician's practice. (Tr. 529-30). Plaintiff testified that she got into a fight with one of the physicians at the prior practice because the doctor accused her of "being on drugs, like a druggie" and Plaintiff was angry about the way she said it. (*Id.* at 530).

On questioning from her attorney, Plaintiff testified that her general mood was sad and that she was "down" and would sometimes cry. (Tr. 532). Plaintiff stated that she relied on routine and that "everything's a struggle." (*Id.* at 533). She further testified that she does not get along with people and that she finds the majority of people rude. (*Id.*). Plaintiff described getting into an argument with a stranger about the etiquette of holding a door open. (*Id.* at 534). She stated that she liked to be "all by [herself]" and that she kept her curtains closed because she is fearful of other people. (*Id.* at 534-35).

Plaintiff testified that she had one friend, and that she would occasionally watch the friend's baby or go to the grocery store with her. (Tr. 535). Plaintiff further testified that she had no hobbies and that she would pass time by sleeping, watching television, cleaning, and pacing "a lot." (*Id.*). Plaintiff stated that she was unable to focus and that she had difficulty dealing with change. (*Id.* at 536).

### C.      Vocational Expert's Testimony

VE Manzi also testified before ALJ Costello.  (Tr. 538-46).  VE Manzi testified that Plaintiff had previously been employed as a debt collector, which is sedentary, skilled work; a data entry clerk, which is light, semi-skilled work; a waitress, which is light, semi-skilled work; a customer service clerk, which is light, semi-skilled work; and a cashier checker, which is light, semi-skilled work.  (*Id.* at 539).

The ALJ presented VE Manzi with a hypothetical question.  (Tr. 540).  The VE was asked to consider someone of Plaintiff's age, education, and experience who could perform light work; was limited to occasional stooping, kneeling, and crouching; could not climb ladders, ropes, or scaffolds; could occasionally crawl; was limited to frequent handling and fingering; could not operate heavy machinery; could perform simple tasks; was limited to low-stress work, defined as work involving occasional decision-making; and could have only occasional interaction with coworkers and the general public.  (*Id.* at 540-41).  VE Manzi testified that a hypothetical individual with these abilities and restrictions would not be able to perform any of Plaintiff's past work.  (*Id.* at 541).  The VE further testified that such a hypothetical individual would be able to perform occupations available in the national economy including cafeteria attendant and laundry sorter.  (*Id.*).

The ALJ then asked the VE to consider a hypothetical individual who with the abilities and restrictions listed above who could only work in an environment where there were no changes in the work setting or the work duties.  (Tr. 541).  VE Manzi testified

that such a hypothetical individual could perform as a laundry sorter or a photocopy machine operator. (*Id.*).

The ALJ next asked the VE to consider someone of Plaintiff's age, education, and experience who could perform sedentary work; could stand for no more than two hours; could not crawl or stoop; could occasionally handle and finger; was unable to make decisions 25% of the time; and was unable to maintain attention 25% of the time. (Tr. 542). VE Manzi testified that such a hypothetical individual would not be able to perform any of Plaintiff's past work or any other work in the national economy. (*Id.* at 543).

The ALJ then returned to the first hypothetical individual described above, and asked whether the VE's answer would change if that individual also needed to change position briefly every half-hour. (Tr. 543). The VE stated that his answer would not change. (*Id.*).

Finally, the ALJ asked the VE to consider a hypothetical individual who could perform light work but could only occasionally finger or handle and could not make decisions or maintain attention 25% of the time. (Tr. 543). The VE testified that such an individual could not do any unskilled work in the economy. (*Id.*).

Plaintiff's attorney asked the VE whether a laundry sorter worked in conjunction with other people. (Tr. 544). The VE stated that it was "not teamwork" and that they were not "necessarily interacting" with other people. (*Id.*). The VE also testified that a person who was unable to maintain a regular schedule 20% of the time would be fired.

(*Id*. at 545).  The VE further testified that an individual who had great difficulty making simple decisions would not be able to perform any job.  (*Id*. at 546).

### D.   Summary of the Medical Evidence

The Court assumes the parties' familiarity with the medical record, which is summarized below.

On October 12, 2007, Plaintiff was seen by Dr. Sheryl Holley at Unity Family Medicine at St. Bernards ("Unity").  (Tr. 254-55).  Plaintiff reported depression; feeling anxious, fearful thoughts; compulsive thoughts or behaviors; irritable mood; diminished interest or pleasure; panic attacks; poor concentration; indecisiveness; restlessness or sluggishness; significant change in appetite; and sleep disturbance.  (*Id*. at 254).  Dr. Holley opined that Plaintiff had the symptoms of a "major depressive episode."  (*Id*.).  Dr. Holley discussed medications with Plaintiff, but Plaintiff did not wish to take medication at that time.  (*Id*. at 255).  Plaintiff was referred to Greece Mental Health for counseling.  (*Id*.).

Plaintiff saw LMSW Jason Goldswer on October 30, 2007.  (Tr. 274-283).  Plaintiff presented with depression and anxiety.  (*Id*. at 274).  Plaintiff told LMSW Goldswer that "something [was] not right" and she was just looking for help.  (*Id*. at 275).  LMSW Goldswer provisionally assessed Plaintiff with an unspecified mood disorder and obsessive-compulsive disorder.  (*Id*. at 283).  The primary diagnosis was an unspecified mood disorder, and Plaintiff had a Global Assessment of Functioning ("GAF") score of 50.  (*Id*.).

On November 30, 2007, Dr. Stacey Martino performed a psychiatric evaluation of Plaintiff. (Tr. 263-273). Dr. Martino assessed Plaintiff with recurrent major depression and an unspecified mood disorder and assigned her a GAF score of 55. (*Id.* at 272).

On February 25, 2009, Plaintiff was discharged from care at Unity due to a loss of contact. (Tr. 258-262).

On October 13, 2009, Dr. Harbinder Toor performed a consultative evaluation of Plaintiff. (Tr. 285-88). Plaintiff reported constant dull, achy pain, which she rated as a nine out of ten. (*Id.*). Plaintiff reported having trouble standing, walking, bending, lifting, or sitting for long periods of time. (*Id.*). Plaintiff told Dr. Toor that she had experienced tingling, numbness, and a burning pain in her arms and hands for the past few years. (*Id.*). Plaintiff further stated that she had difficulty holding, grasping, reaching, twisting, bending, and extending her neck. (*Id.*).

On physical examination, Plaintiff's hand and finger dexterity was not intact, she had mild difficulty with grasping, holding, and writing, and her grip strength was 4/5 bilaterally. (*Id.* at 286). Plaintiff had cervical spine flexion of 20 degrees, extension of zero degrees, lateral flexion of 30 degrees, and rotation of 30 degrees, with pain in her neck and no cervical or paracervical pain or spasm and no trigger points. (*Id.*). She had pain in her shoulders, but full and normal shoulder movements. (*Id.*). Plaintiff had a full range of motion in her elbows, forearms, wrists, and fingers bilaterally, as well as no joint inflammation, effusion, or instability. (*Id.*). Her strength was 5/5 in her proximal and distal muscles with no muscle atrophy and no sensory abnormality. (*Id.*). Reflexes were physiologic and equal. (*Id.*). Plaintiff had minimal scoliosis with convexity to the right.

(*Id.*).   She had full flexion, extension, lateral flexion, and rotary movements in her thoracic and lumbar spines, with mild pain in the back.   (*Id.*).   No spinal or paraspinal tenderness was observed, nor was any spasm or trigger points.   (*Id.*).   A straight leg raise test was negative bilaterally in the supine position.   (*Id.*).   Plaintiff had a full range of motion in her hips, knees, and ankles.   (*Id.* at 287).

Dr. Toor assessed Plaintiff with a history of minimal scoliosis, back pain, neck pain, shoulder pain, hand pain/carpal tunnel syndrome, arthritis, and mental health issues. (Tr. 287).   He opined that Plaintiff's prognosis was "good" and that she had mild limitations for pushing, pulling, lifting, reaching, grasping, holding, writing, standing, walking or sitting for a long time.   (*Id.*).   He stated that she should be evaluated by a psychologist or psychiatrist with respect to her mental health issues.   (*Id.*).

Also on October 13, 2009, psychologist Dr. Christine Ransom performed a consultative psychiatric evaluation of Plaintiff.   (Tr. 296-99).   Dr. Ransom observed that Plaintiff had avoidant eye contact; was fluent and intelligible with a clear, moderately irritable voice; was coherent and goal directed with no evidence of hallucinations, delusions, or paranoia in the evaluation setting; expressed moderately irritable affects; was moderately impaired in attention and concentration, seemingly due to emotional disturbance; was moderately impaired in immediate memory, seemingly due to emotional disturbance; was of average intellectual functioning; and had good insight and judgment. (*Id.* at 297-98).   Dr. Ransom diagnosed Plaintiff with moderate bipolar disorder with psychotic features, mild scoliosis, and carpal tunnel arthritis.   (*Id.* at 298-99).   Dr. Ransom opined that Plaintiff could "follow and understand simple directions and

- 11 -

instructions, perform simple tasks independently, maintain attention and concentration for simple tasks, maintain a simple regular schedule, [and] learn simple new tasks," but would have "moderate difficulty performing complex tasks, relat[ing] adequately with others[,] and appropriately deal[ing] with stress." (*Id.* at 298). Dr. Ransom stated that Plaintiff's prognosis was "fair to good with appropriate treatment." (*Id.* at 299).

Also on October 12, 2009, an x-ray of Plaintiff's lumbosacral spine was taken. (Tr. 289). The x-ray revealed that the height of the vertebral bodies and intervertebral disc spaces was relatively well-maintained and that pedicles were intact throughout. (*Id.*).

On October 23, 3009, Dr. C. Vriesema completed a physical residual functional capacity assessment for Plaintiff. (Tr. 290-295). Dr. Vriesema reported a primary diagnosis of neck and back pain and a secondary diagnosis of minimal scoliosis. (*Id.* at 290). Dr. Vriesema opined that Plaintiff could occasionally lift and/or carry 20 pounds; could frequently lift and/or carry ten pounds; could stand and/or walk for two hours in an eight hour workday; could sit for about six hours in an eight hour workday; was unlimited in her ability to push and/or pull; could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; could occasionally balance, stoop, kneel, crouch, or crawl; and had no manipulative, visual, communicative, or environmental limitations. (*Id.* at 291-94).

On October 27, 2009, Dr. E. Kamin, a state agency psychologist, reviewed the medical record. (Tr. 328-344). Dr. Kamin opined that Plaintiff was able to "understand and remember simple instructions, maintain adequate concentration and persistence,

interact adequately with others, and adapt to changes in her work environment" and retained the capacity to perform unskilled work. (*Id.* at 344). Dr. Kamin indicated Plaintiff was mildly limited in activities of daily living and maintaining social functioning, and moderately limited in maintaining concentration, persistence or pace. (*Id.* at 338).

On February 6, 2010, Plaintiff was treated at the Unity emergency department for left side rib pain. (Tr. 746). She reported having been "jumped" by a group of girls an hour earlier and kicked and punched in her left side. (*Id.* at 755). On February 8, 2010, Plaintiff saw Kelly E. Piccone, RPA C, for a follow up for continued left side pain. (*Id.* at 831). Plaintiff was diagnosed with acute pain due to trauma. (*Id.* at 832). On March 11, 2010, Plaintiff was treated by physician's assistant Deborah DeMilio for abdominal discomfort. (*Id.* at 417). Plaintiff was diagnosed with acute pain due to trauma. (*Id.* at 417).

On July 1, 2010, Dr. Kavintha Finnity evaluated Plaintiff on behalf of the Monroe County Department of Social Services. (Tr. 322-327). On mental status examination, Plaintiff's mood was dysthymic and irritable; affect was flat and irritated; attention, concentration, and recent and remote memory skills were mildly impaired; and insight and judgment were fair. (*Id.* at 323-24). Dr. Finnity opined that Plaintiff exhibited normal functioning in terms of following, understanding, and remembering simple instructions and directions; performing complex tasks independently; using public transportation; and performing low stress and simple tasks. (*Id.* at 325). Dr. Finnity opined that Plaintiff was moderately limited in maintaining attention and concentration

for routine tasks, attending to a routine and maintaining a schedule, and maintaining basic standards of hygiene and grooming. (*Id.*). Dr. Finnity further opined that Plaintiff was unable to perform any activities except treatment or rehabilitation for a likely period of three to six months. (*Id.* at 326).

On September 19, 2010, Plaintiff was treated at the Rochester General Hospital emergency department for lower back pain following a car accident. (Tr. 742). She was assessed with MVC and acute low back pain and prescribed Naprosyn as needed for pain. (*Id.* at 743).

Plaintiff presented to the emergency department at Unity on September 21, 2010. (Tr. 426-27). Plaintiff reported experiencing worsening lower back pain. (*Id.* at 427). X-rays taken on September 29, 2010, showed no abnormalities in Plaintiff's lumbar and cervical spine, and "minor disc degenerative change" in her thoracic spine. (*Id.* at 424-25).

On October 4, 2010, Dr. Shaza Janmuhammad evaluated Plaintiff for neck pain related to her car accident. (Tr. 414-15). Plaintiff complained of mild burning pain in her right shoulder. (*Id.* at 414). Plaintiff was not taking the Naprosyn and had not taken the prescribed Flexeril after reading about the side effects. (*Id.*). Dr. Janmuhammad discussed the pros and cons of Flexeril with Plaintiff and she agreed to try it. (*Id.* at 415). Dr. Janmuhammad also encouraged Plaintiff to take her Naprosyn. (*Id.*). Dr. Janmuhammad indicated that he would refer Plaintiff to physical therapy if her pain did not improve. (*Id.*).

Plaintiff was seen by Dr. Janmuhammad on November 8, 2010.  (Tr. 409-10).  Dr. Janmuhammad observed that Plaintiff's back pain had continued since her car accident. (*Id.* at 409).  On examination, Dr. Janmuhammed noted pain along the trapezius and post SCM.  (*Id.* at 410).  Plaintiff was assessed with sprain of back and pain neck cervicalgia. (*Id.* at 410).  Dr. Janmuhammad continued Plaintiff's current medications, requested an MRI, and referred her to physical therapy. (*Id.*).

On December 16, 2010, Plaintiff was seen by LMSW Lechner.  (Tr. 379-85). LMSW Lechner diagnosed Plaintiff with depressive disorder not otherwise specific. (*Id.*).  Plaintiff reported experiencing depressive symptoms that were "unmanageable," as well as anxiety and insomnia.  (*Id.* at 380).

Plaintiff was seen by Dr. Janmuhammad on December 28, 2010.  (Tr. 407-08). Plaintiff reported symptoms of arthritis, back pain, and allergies. (*Id.*).    Dr. Janmuhammad noted that chiropractic treatments had not helped Plaintiff's back pain and that Plaintiff had not followed through with physical therapy.  (*Id.* at  407).   On examination, Plaintiff had no skeletal tenderness or deformity but her left hand had a positive Tinel's sign.  (*Id.* at 408).   Dr. Janmuhammad recommended Plaintiff pursue physical therapy, get an MRI, take naproxen, and undergo neurological studies on her hand.  (*Id.*).

Plaintiff was seen by LMSW Lechner on January 13, 2011.  (Tr. 375-77; 391-93). LMSW Lechner diagnosed Plaintiff with depressive disorder and assigned a GAF score of 55.  (*Id.* at 391).  LMSW Lechner noted Plaintiff was evasive, which made it difficult to assess symptoms and current stressors. (*Id.* at 375). On examination, Plaintiff had an

anxious mood, anxious affect, misperceptions, blocking thought form, and fair judgment. (*Id.* at 375-76).

Plaintiff met with LMSW Lechner on January 21, 2011. (Tr. 371). Plaintiff stated she had "nothing to talk about, but then that she had a lot to talk about but does not feel like getting into it right now." (*Id.* at 371). A mental status evaluation showed that Plaintiff's behavior was evasive and restless, her speech was pressured, her thought form was remarkable for blocking with flight of ideas, and that she had anxious and depressed mood and affect, fair judgment, and distractible cognition. (*Id.* at 371-72).

An MRI of Plaintiff's spine was performed on February 10, 2011. (Tr. 419). It revealed straightening of normal cervical lordosis, minor annular bulging, mold to moderate narrowing of the C5-6 disc, C5-6 right paracentral disprotrusion with mild flattening of the ventral cervical sac and mild canal narrowing, and C6-7 mild left paracentral disc bulge. (*Id.*). A neurologic examination of Plaintiff's hands also conducted on February 10, 2011, was normal. (*Id.* at 420-21).

On February 23, 2011, Plaintiff saw Dr. Janmuhammad and reported hand and back pain. (Tr. 405-406). Dr. Janmuhammad noted that Plaintiff was not pleased with a recent consult with a neurologist. (*Id.* at 405). Dr. Janmuhammad instructed Plaintiff to follow up with the spinecenter and a specialist for her hand pain. (*Id.* at 406).

Also on February 23, 2011, Dr. Janmuhammad completed a medical source statement of ability to do work-related activities. (Tr. 346-49). Dr. Janmuhammad opined that Plaintiff could only occasionally lift or carry weights up to ten pounds; could stand or walk for less than two hours in an eight-hour workday; would need to alternate

sitting and standing; had limited ability to push or pull; should never crawl or stoop and could only occasionally climb, balance, kneel, or crouch; and had limited manipulative ability in terms of handling, fingering, and feeling. (*Id.* at 346-48).

Plaintiff saw Dr. Janmuhammad on March 3, 2011. (Tr. 401). Plaintiff reported persistent discomfort. (*Id.*). Dr. Janmuhammad noted that Plaintiff had gone to a chiropractor, which helped briefly, but had not followed up with her referrals to the spine center and physical therapy. (*Id.*). Dr. Janmuhammad continued Plaintiff's pain medications and advised her to follow-up with physical therapy and get an appointment with the spine center. (*Id.* at 402).

On March 15, 2011, LMSW Lechner completed a mental residual functional capacity assessment regarding Plaintiff. (Tr. 353-54). LMSW Lechner opined that Plaintiff would have severe limitations in: maintaining attention and concentration in a workday; making simple work-related decisions; completing a workday or workweek without interruptions from her psychiatric symptoms; and setting realistic goals or planning independently. (*Id.*). LMSW Lechner also opined that Plaintiff had major depressive disorder that imposed severe depressive symptoms, and that Plaintiff needed further evaluation to rule out obsessive-compulsive disorder. (*Id.* at 354).

Plaintiff saw Dr. Janmuhammad on March 28, 2011. (Tr. 396-97). Plaintiff reported ongoing back pain and requested stronger pain medications. (*Id.* at 396). Plaintiff also reported not taking her depression medication because she feared that it would not fully dissolve in her stomach. (*Id.*). Plaintiff reported that she had a physical therapy appointment scheduled for the following day. (*Id.*). Dr. Janmuhammad

- 17 -

encouraged Plaintiff to take her depression medication and to follow-up with the spine clinic. (*Id*. at 397).

On April 18, 2011, Plaintiff saw Dr. Holley. (Tr. 394-95). Plaintiff reported that the Tylenol with codeine she had previously been prescribed made her very tired. (*Id*. at 394). Plaintiff said she had an appointment with the spine specialist on May 9th, and wanted to try a different pain medication. (*Id*.). Dr. Holley noted that Plaintiff had become "very irate" because Dr. Holley asked to perform a "urine tox screen." (*Id*. at 395). Plaintiff yelled at Dr. Holley that she was not a drug addict. (*Id*.).

On April 26, 2011, Dr. Janmuhammad evaluated Plaintiff for anxiety and lumbago. (Tr. 788-89). Plaintiff reported feeling "an[t]sy" but stated that she was "dealing with it." (*Id*. at 788). Plaintiff was scheduled to see the spine clinic the following week. (*Id*.). Plaintiff's back pain was "sub-optimal[ly] control[led]." (*Id*. at 789).

Plaintiff was evaluated by psychiatrist Dr. Kevin McIntyre on July 13, 2011. (Tr. 927-35). Dr. McIntyre noted a differential diagnosis of depressive disorder, anxiety disorder, and "perhaps ADHD." (*Id*. at 934). He started Plaintiff on Paxil. (*Id*.). He advised Plaintiff to continue with individual therapy. (*Id*. at 935).

Plaintiff saw LMSW Lechner on March 29, 2012. (Tr. 917-20). LMSW Lechner noted that Plaintiff's symptoms were interfering with her treatment and stressed the importance of medication compliance. (*Id*. at 917). Plaintiff reported that her symptoms were severely impacting her daily functioning. (*Id*.). She presented with an anxious and

depressed mood and exhibited obsessions, paranoid ideation, and misperceptions. (*Id*. at 918).

On April 17, 2012, Plaintiff saw psychiatrist Dr. Syed Mustafa. (Tr. 890-893). Plaintiff was prescribed Wellbutrin. (*Id*. at 890).

Dr. Toor performed a second consultative examination of Plaintiff on April 18, 2012. (Tr. 894-899). Dr. Toor opined that Plaintiff had "moderate limitations to standing, walking, sitting, bending, lifting or twisting of the cervical spine"; that "pain interfere[d] with her physical routine"; and that she "should avoid irritants or other factors which can precipitate asthma." (*Id*. at 897). An x-ray of Plaintiff's lumbosacral spine revealed straightening. (*Id*. at 898).

Also on April 18, 2012, Plaintiff underwent a second psychological consultative examination with Dr. Ransom. (Tr. 899-902). Dr. Ransom opined that Plaintiff would have "moderate difficulty following and understanding simple directions and instructions, perform[ing] simple tasks independently, maintain[ing] attention and concentration for simple tasks, maintain[ing] a simple regular schedule, [and] learn[ing] simple new tasks," and "moderate to marked difficulty performing complex tasks, relat[ing] adequately with others[,] and appropriately deal[ing] with stress." (*Id*. at 901-02

Dr. Kamin reviewed Plaintiff's medical record for a second time on April 24, 2012. (Tr. 913). Dr. Kamin opined that Plaintiff's affective and anxiety disorders imposed mild limitations on her daily activities and moderate limitations on her social functioning and ability to maintain concentration, persistence, or pace. (*Id*.).

On May 14, 2012, LMSW Lechner completed a treatment plan for Plaintiff. (Tr. 921-926). Plaintiff agreed to continue medication compliance for at least three months. (*Id.* at 925-926). On June 14, 2012, Dr. Mustafa increased Plaintiff's Wellbutrin dosage. (*Id.* at 888).

On August 19, 2012, LMSW Lechner completed a treatment plan. (Tr. 959-62). She noted that Plaintiff had made little progress and that she was struggling to manage her symptoms. (*Id.* at 962). Plaintiff reported taking her Wellbutrin as prescribed and agreed to continue to attend appointments with Dr. Mustafa for medication management. (*Id.*)

On September 24, 2012, Plaintiff was seen by Dr. Mustafa. (Tr. 886-887). Plaintiff had abruptly discontinued her Wellbutrin on her own initiative. (*Id.* at 886). Plaintiff stated that she did not want to be on any psychotropics at that time. (*Id.*).

Plaintiff saw Dr. Mustafa on November 12, 2012. (Tr. 884-85). Plaintiff expressed interest in taking an antidepressant,which Dr. Mustafa prescribed. (*Id.* at 884).

LMSW Lechner completed a treatment plan for Plaintiff on November 25, 2012. (Tr. 953-957). Plaintiff was compliant with her medications and had not shown improvement in her symptoms. (*Id.*).

On December 3, 2012, Dr. Anureet Gill, M.D., completed a physical assessment for determination of employability for Monroe County. (Tr. 941-944). Dr. Gill assessed Plaintiff with low back pain with sciatica, depression, and anxiety. (*Id.* at 942). Dr. Gill opined that Plaintiff was "very limited" in walking, standing, sitting, pushing, pulling,

bending, and lifting and carrying and could perform those activities only for one to two hours in an eight hour workday.  (*Id.* at 944).

On December 5, 2012, LMSW Lechner submitted a mental functional capacity evaluation in which she opined that Plaintiff was "very limited" in her ability to: perform simple and complex tasks independently; maintain attention and concentration for rote tasks; attend to a routine and maintain a schedule; and perform low stress and simple tasks.  (Tr. 945-48).  LMSW Lechner estimated that Plaintiff would be unable to participate in activities other than treatment for six months.  (*Id.* at 947).

On February 4, 2013, psychiatric nurse practitioner ("NP") Kathleen M. Calnan examined Plaintiff.  (Tr. 878-883).  NP Calnan noted Plaintiff had paranoid ideation, as well as a belief in mind reading and thought insertion.  (*Id.* at 878).  Plaintiff presented as anxious and distractible, with anxious mood and congruent affect.  Plaintiff was started on Risperdal for paranoia and psychotic symptoms. (*Id.* at 879).

On February 17, 2013, LMSW Lechner completed a treatment plan review for Plaintiff.  (Tr. 949-952).  Plaintiff's medication compliance was "complete" and her symptoms had not improved.  (*Id.*).

On March 18, 2013, Plaintiff was treated by student nurse practitioner Samantha Gaetano. (Tr. 874).  Plaintiff was concerned about the potential side effects of her medications, and reported that she had not started taking Risperdal because the medication information sheet stated it could cause a stroke.  (*Id.* at 874).  She also was concerned about possible coma side effects from Luvox.  (*Id.*).  On mental examination Plaintiff's mood was anxious; concentration was poor; she exhibited average/intermittent

eye contact; insight was superficial; and judgment was fair.  (*Id.* at 876).  She was diagnosed with anxiety disorder, psychotic disorder, and obsessive compulsive disorder. (*Id.* at 873).

A May 4, 2013 treatment plan by LMSW Lechner authored a treatment plan dated May 4, 2013, that stated that Plaintiff had started her medications but missed multiple doses.  (Tr. 869-72).  LMSW Lechner noted Plaintiff continued to struggle to engage in treatment and had not made significant progress.  (*Id.* at 872).

On June 3, 2013, Plaintiff returned to NP Calnan for medication management.  (Tr. 863-64).  Plaintiff reported being anxious about arriving late, partial compliant with medications, paranoid ideation, and anxious mood with congruent affect.  (*Id.* at 864). Plaintiff had been taking her medications "most of the time."  (*Id.*).  NP Calnan advised Plaintiff to take a second Risperdal if she had paranoid thoughts.  (*Id.* at 864).

On August 5, 2013, Plaintiff returned to NP Calnan for medication management. (Tr. 994-95).  Plaintiff reported paranoid ideation, and only taking half her pills because she was afraid to take more.  (*Id.* at 995).

### E.   Determining Disability Under the Social Security Act and the ALJ's Decision

For both Social Security Insurance and Disability Insurance Benefits, the Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A); *see*

- 22 -

*Rembert v. Colvin*, No. 13-CV-638A, 2014 WL 950141, at *6 (W.D.N.Y. Mar. 11, 2014).

A disabling impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostics techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). The burden is on the claimant to demonstrate that he is disabled within the meaning of the Act. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002). The individual will only be declared disabled if his impairment is of such severity that he is unable to do his previous work and cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful activity. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the ALJ follows a five-step sequential analysis. If the ALJ makes a determination of disability at any step, the evaluation will not continue to the next step. 20 C.F.R. § 416.920(a)(4). The five steps are as follows:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

- 23 -

> 5.     If the claimant is unable to perform his or her past work, the
> Commissioner then determines whether there is other work which the
> claimant could perform.  The Commissioner bears the burden of proof on
> this last step, while the claimant has the burden on the first four steps.

*Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000); *see* 20 C.F.R. §§ 404.1520, 416.920.

In applying the five-step sequential evaluation in this matter, ALJ Costello made the following determinations.  At step one, the ALJ found that Plaintiff was not engaged in substantial gainful activity during the relevant timeframe. (Tr. 456).  At step two, the ALJ determined that Plaintiff had the following severe impairments: bipolar disorder; obsessive-compulsive disorder; carpal tunnel syndrome; scoliosis; and mild cervical disc disease.  (*Id.*).  However, the ALJ stated that Plaintiff did not meet or equal any listed impairment under step three.  (*Id.* at 457).  At step four, the ALJ evaluated Plaintiff's residual functional capacity ("RFC") and found that Plaintiff could:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)
> except that the [Plaintiff] is able to push and/or pull up to twenty pounds; is
> occasionally able to stoop, crouch, and crawl; is never able to climb
> ladders, ropes, or scaffolds; is frequently, but not constantly, able to finger
> and handle; must change positions briefly every half an hour; is able to do
> only simple tasks; is able to do low stress work, which is defined as
> involving only occasional decision making; and is able to have occasional
> interaction with coworkers and the general public.

(*Id.* at 458).  The ALJ also determined at step four that Plaintiff could not perform her past relevant work.  (*Id.* at 470).  At step five, the ALJ relied on the testimony of VE Manzi to find that Plaintiff was capable of performing work in representative occupations such as laundry sorter and photocopy machine operator.  (*Id.* at 470-71).  The ALJ ultimately concluded that Plaintiff was not disabled.  (*Id.* at 471)

III.   **Discussion**

A.   **Standard of Review**

This Court has jurisdiction to review the final decision of the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3). "In reviewing a decision of the Commissioner, a court may 'enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.'" *Rehr v. Barnhart*, 431 F. Supp. 2d 312, 317 (E.D.N.Y. 2006) (quoting 42 U.S.C. § 405(g)). 42 U.S.C. § 405(g) directs the Court to accept findings of fact made by the Commissioner, so long as the findings are supported by substantial evidence in the record. Substantial evidence is "more than a mere scintilla," and "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The scope of the Court's review is limited to determining whether the Commissioner applied the appropriate legal standards in evaluating Plaintiff's claim, and whether the Commissioner's findings were supported by substantial evidence on the record. *See Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (stating that a reviewing Court does not examine a benefits case *de novo*). If the Court finds no legal

error, and that there is substantial evidence for the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for the plaintiff's position. *See Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Judgment on the pleadings may be granted under Rule 12(c) where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988).

### B.     Duty to Develop the Record

Plaintiff's first argument is that the ALJ failed to fulfill his duty to develop the record in this matter. (Dkt. 11-1 at 19-22).  Specifically, Plaintiff argues that the ALJ should have sought out the treatment records for Plaintiff's therapy with LMSW Lechner from May 2012 to August 2013. (*Id.* at 20).

Although "[t]he claimant has the general burden of proving that he or she has a disability within the meaning of the Act . . . because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks and brackets omitted).   "[A]n ALJ may not rely, as factfinders in adversarial proceedings customarily do, on the *absence* of probative evidence supporting the opinions of a claimant's expert, without making an affirmative effort to fill any gaps in the record before him." *Thomas v. Barnhart*, No. 01 Civ. 518(GEL), 2002 WL 31433606, at *4 (S.D.N.Y. Oct. 30, 2002) (emphasis in original).  "In fact, where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a

claimant's medical history. . . ." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

"Ultimately, 'it is the ALJ's duty to investigate and develop the arguments both for and against the granting of benefits.'" *Amrock v. Colvin*, No. 3:12-CV-55(FJS), 2014 WL 1293452, at *4 (N.D.N.Y. Mar. 31, 2014) (quoting *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004)).  "This affirmative obligation is present even when counsel represents the claimant." *Id.*

However, "the affirmative duty imposed on an ALJ to develop an administrative record fully is not without limits." *Amrock*, 2014 WL 1293452, at *4.  The ALJ is not required to "obtain every medical file from every medical source the claimant has seen." *Ubiles v. Astrue*, No. 11-CV-6340T(MAT), 2012 WL 2572772 at *10 (W.D.N.Y. July 2, 2002).  The ALJ is only required to "request additional evidence if the administrative record does not contain sufficient evidence to make a fair determination." *Id.*  Indeed, "[o]n the 'flip-side' of this same proposition, 'where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.'"  *Hart v. Colvin*, No. 12-CV-1043-JTC, 2014 WL 916747, at *7 (W.D.N.Y. Mar. 10, 2014) (quoting *Petrie v. Astrue*, 412 Fed. App'x 401, 406 (2d Cir. 2011)).

In this case, Plaintiff argues that there were obvious gaps in the administrative record and that the ALJ improperly relied on these gaps to conclude that Plaintiff was not disabled.  The Court agrees.  It was clear from the record in this matter that Plaintiff had been treated by LMSW Lechner between May 2012 and August 2013, yet the ALJ does

not appear to have even inquired into the missing treatment records.  Moreover, the ALJ

afforded LMSW Lechner's medical source statements regarding Plaintiff "little weight"

because they were not supported by evidence in the record.  (Tr. 467).  The prejudice

here is apparent – it may well be the case that the support for LMSW Lechner's medical

source statements is found in the missing treatment notes, which the ALJ failed to make

efforts to obtain.  In other words, the gaps in the administrative record were obvious and

substantial, and the ALJ's failure to fill them renders remand appropriate.  *See*

*Dambrowski v. Astrue*, 590 F. Supp. 2d 579, 585 (S.D.N.Y. 2008) (remand is appropriate

where the ALJ has failed to sufficiently develop the administrative record).

### C.    Failure to Properly Evaluate Medical Opinions of Record

Plaintiff also argues that the ALJ failed to properly evaluate the medical opinions

of record, due in part to having improperly minimized Plaintiff's mental illness.  (Dkt.

11-1 at 22-25, 31-35).  Again, the Court agrees.

It was improper for the ALJ in this case to reject the opinion of treating physician

Dr. Janmuhammad based on the ALJ's own assessment of the severity of Plaintiff's

physical symptoms.  "[I]t is well-settled that the ALJ cannot arbitrarily substitute his own

judgment for competent medical opinion. . . .  [W]hile an [ALJ] is free to resolve issues

of credibility as to lay testimony or to choose between properly submitted medical

opinions, he is not free to set his own expertise against that of a physician who [submitted

an opinion to or] testified before him."  *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir.

1998) (internal quotation and citation omitted); *see also Sublette v. Astrue*, 856 F. Supp.

2d 614, 619 (W.D.N.Y 2012).  Moreover, "[u]nder the regulations' 'treating physician

rule,' a treating physician's opinion will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record.'" *Ryan v. Astrue*, No. 12 Civ. 8075(HBP), 2014 WL 1089041, at *9 (S.D.N.Y. Mar. 18, 2014) (quoting 20 C.F.R. § 404.1527(c)(2)). "[T]he Second Circuit has instructed that the courts should not hesitate to remand when the Commissioner has not provided good reasons for the weight given to a treating physician[']s opinion or when the ALJ's opinion does not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Silvers v. Colvin*, 67 F. Supp. 3d 570, 578 (W.D.N.Y. 2014) (internal quotation and citations omitted).

Here, the ALJ rejected Dr. Janmuhammad's opinion in significant part because he viewed the Plaintiff's testimony regarding her ability to clean her home as inconsistent with Dr. Janmuhammad's medical opinion. (Tr. 462-63). Not only did the ALJ significantly mischaracterize Plaintiff's hearing testimony,[2] he also gave no consideration to the fact that Plaintiff's compulsion to clean was not a voluntary behavior, but was a symptom of her severe mental health issues. In doing so, the ALJ "demonstrated a fundamental misunderstanding of the nature of behavioral disorders." *Brown ex rel. J.B. v. Colvin*, No. 1:12-CV-1062 MAT, 2015 WL 1647094, at *5 (W.D.N.Y. Apr. 14, 2015).

---

[2]     For example, the ALJ claimed "[Plaintiff] indicated that she pulls out both the refrigerator and the stove when cleaning. . . . This behavior shows that the [Plaintiff] is able to push, pull, crouch, stoop, and lift more than ten pounds." (Tr. 462-63). However, a review of the transcript of the hearing shows that Plaintiff specified that her refrigerator was on wheels and that she was able to slide it out on its wheels and then use a "long" vacuum cleaner to dust underneath. Nothing about this testimony suggests the ability to crouch, stoop, or lift significant weights.

The very nature of obsessive-compulsive disorder (an impairment that the AJL in this case determined was severe) indicates an inability to stop oneself from engaging in behavior, regardless of the cost to one's physical health.  In other words, that Plaintiff's mental health impairments caused her to engage in certain behavior is not evidence that Plaintiff's physician was incorrect when he opined that she should not engage in such behavior.  The ALJ's determination that Plaintiff was capable of greater physical activity than recommended by her treating physician based on his own interpretation of Plaintiff's physical activities and without regard to the nature of her mental health impairments represented an arbitrary substitution of his own judgment for that of a competent medical professional and does not constitute a "good reason" for affording little weight to Dr. Janmuhammad's opinion.

Additionally, the ALJ's RFC determination was not supported by substantial evidence.  The ALJ claimed that his assessed RFC was supported by the opinions of Drs. Finnity, Kamin, and Toor.  (Tr. 470).  However, as Plaintiff points out, both Dr. Finnity and Dr. Toor's opinions imposed significantly greater restrictions on Plaintiff than are reflected in the RFC determination.  Dr. Finnity opined that Plaintiff was "moderately limited" with respect to maintaining attention and concentration for rote tasks and regularly attending to a routine and maintaining a schedule.  (Tr. 325).  "Moderately limited" was defined as "unable to function 50% of the time."  (*Id.*).  Nothing in the ALJ's RFC determination reflects these limitations.  Significantly, VE Manzi testified that a hypothetical individual who could not make decisions or maintain attention 25% of the time would be unable to perform any unskilled work in the economy, and that a

hypothetical individual who could not maintain a regular schedule 20% of the time would be fired from any employment. (Tr. 543-45). In other words, the ALJ's unexplained decision not to factor these limitations identified by Dr. Finnity into his RFC determination likely significantly impacted the ultimate determination of disability.

Similarly, Dr. Toor opined that Plantiff was moderately limited in standing, walking, and sitting (Tr. 897), yet the ALJ found that she was capable of light work, which requires standing for up to six hours in an eight hour workday. Again, the ALJ did not identify any reason for his failure to incorporate this limitation into the RFC determination.

Dr. Kamin's assessment does arguably support the RFC determination.[3] However, Dr. Kamin never treated or examined Plaintiff; his review was limited to the medical record. "The general rule is that the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability. The advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant." *Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990) (internal quotations omitted). "A psychiatric opinion based on a face-to-face interview with the patient is more reliable than an opinion based on a review of a cold, medical record. . . ." *Velazquez v. Barnhart*, 518 F. Supp. 2d 520, 254 (W.D.N.Y. 2007). Here, particularly in light of the ALJ's failure to adequately explain his decision to reject the opinions of the treating and examining physicians, Dr.

---

[3]   However, even Dr. Kamin opined that Plaintiff was "moderately limited" in maintaining concentration. (Tr. 338, 913).

Kamin's opinion alone does not constitute substantial evidence sufficient to support the RFC determination.

### D.    Credibility Analysis

Finally, Plaintiff contends that the ALJ failed to apply the appropriate legal standards when finding her not fully credible.   (Dkt. 11-1 at 27-31).   Specifically, Plaintiff argues that it was improper for the ALJ to draw an adverse inference from her failure to comply with treatment, because her non-compliance was a symptom of her mental illness.

The Social Security regulations require a two-step process for the ALJ to consider the extent to which subjective evidence of symptoms can reasonably be accepted as consistent with the medical and other objective evidence.   *Brownell v. Comm'r of Soc. Sec.*, No. 1:05-CV-0588 (NPM/VEB), 2009 WL 5214948, at *3 (N.D.N.Y. Nov 23, 2009).   First, the ALJ considers whether the medical evidence shows any impairment "which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(a).   Second, if an impairment is shown, the ALJ must evaluate the "intensity, persistence, or functionally limiting effects" of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work.   20 C.F.R. § 404.1529(b). When the objective medical evidence alone does not substantiate the claimant's alleged symptoms, the ALJ must assess the credibility of the claimant's statements considering the details of the case record as a whole.   20 C.F.R. §§ 404.1529(c)(3)(i)-(vii).

The Court agrees with Plaintiff that the ALJ in this matter improperly based his credibility determination on the symptoms of Plaintiff's mental illness.   With respect to her alleged ability to clean, as discussed at length above, the ALJ's conflation of Plaintiff's compulsive behavior with a voluntary choice/evidence of her true abilities was inappropriate and failed to account for the nature of Plaintiff's mental impairments.

The Court also agrees that it was improper for the ALJ to find Plaintiff not credible based on her past failure to comply with treatment.   It has been noted by courts that "faulting a person with diagnosed mental illnesses . . . for failing to pursue mental health treatment is a questionable practice." *McGregor v. Astrue*, 993 F. Supp. 2d 130, 143 (N.D.N.Y. 2012) (credibility determination was improper where it was based in part on mentally ill plaintiff's failure to seek mental health treatment); *see also Hill v. Astrue*, No. 1:11-CV-0505 MAT, 2013 WL 5472036, at *10 (W.D.N.Y. Sept. 30, 2013); *Day v. Astrue*, No. 07 CV 157 (RJD), 2008 WL 63285, at *5 n.7 (E.D.N.Y. Jan. 3, 2008).   It is clear from the record in this matter that Plaintiff's failure to, for example, take her prescribed medications stemmed from her mental health impairments.   The ALJ's determination that "[Plaintiff's] compliance suggests that the symptoms may not have been as limiting as [Plaintiff] has alleged" (Tr. 469) was improper and further underscores the ALJ's misunderstanding of the nature of Plaintiff's mental illness.   On remand, the Commissioner's assessment of Plaintiff's credibility must take into account all relevant factors, including the difficulties posed by Plaintiff's mental health impairments.

Finally, it is unclear to the Court what weight the ALJ gave to his observation that Plaintiff was able to sit through the hearing.  "This technique is known as the 'sit and squirm index' and has been heavily criticized in this Circuit." *Nix v. Colvin*, No. 15-CV-0328-FPG, 2016 WL 3681463, at *7 (W.D.N.Y. July 6, 2016).  "Although . . . there is no *per se* legal error where the ALJ considers physical demeanor as one of several factors in evaluating credibility[,] such observations should be assigned only limited weight." *Id.* (quotation omitted).  To the extent the ALJ gave his personal observations significant consideration, he erred in doing so.

## IV.   CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Dkt. 13) is denied, Plaintiff's motion for judgment on the pleadings (Dkt. 11) is granted in part, and this matter is remanded for further administrative proceedings consistent with this Decision and Order.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:      August 25, 2016
            Rochester, New York